IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| LEE LEWIS,<br><br>      Plaintiff,<br><br>  v.<br><br>LEWIS ELECTRIC LLC, CCI INC.,<br>ADAM IBARRA (aka ADAN<br>IBARRA), MARY IBARRA, and<br>VINCE COLARELLI,<br><br>      Defendants. | Case No. 19-cv-00527-DKW-KJM<br><br>**ORDER DENYING DEFENDANT<br>COLARELLI'S MOTION FOR<br>SUMMARY JUDGMENT** |

In this breach of contract case, Plaintiff Lee Lewis seeks to hold Defendants Adam and Mary Ibarra and Vince Colarelli personally liable on contracts executed by CCI Inc. ("CCI") and Lewis Electric LLC ("Lewis Electric").   Lewis alleges that the individual defendants' bad faith mismanagement of these companies to further their own—rather than company—interests resulted in Lewis Electric's insolvency and the breach of several contracts between Lewis and the company defendants.

Before the Court is Colarelli's motion for summary judgment.   He argues that, as a minor shareholder with no decision-making authority, he cannot be held

personally liable for the contracts or conduct of CCI or Lewis Electric.   Lewis

disagrees, arguing Colarelli, in fact, controlled CCI and, through it, Lewis Electric,

to serve his own personal interests and was anything but a mere passive investor.

Because a genuine question of material fact remains as to which of these sets of

representations are true, Colarelli's motion is DENIED.

## **RELEVANT BACKGROUND**

The Ibarras and Colarelli are the owners, executives, and managers of CCI.[1]

In February 2015, Lewis, then the owner and sole shareholder of Lewis Electric,

agreed to sell his interest in Lewis Electric to CCI.   Dkt. No. 1 at 3.   Four

contracts were executed as part of the transaction: (1) a Membership Interest

Purchase Agreement ("MIP Agreement") between Lewis and CCI, Dkt. No. 1-1;

(2) a Promissory Note issued by CCI to Lewis, Dkt. No. 1-2; (3) an Employment

Agreement between Lewis and Lewis Electric, Dkt. No 1-3; and (4) a "Side

Agreement" between Lewis and Adam Ibarra, Dkt. No 1-4.   These contracts are

the subject of the present litigation.

---

[1] *See* Dkt. No. 98-6 (listing Colarelli as the incorporator and the Ibarras and Colarelli as directors of CCI); Dkt. No. 98-8 (CCI organizational minutes establishing the Ibarras and Colarelli as directors, Adam Ibarra as President, Mary Ibarra as Secretary, and Colarelli as Vice President and Treasurer); Dkt. No. 98-11 (explaining the CCI Board of Directors issued 6,100 shares to Adam Ibarra, 1,900 shares to Mary Ibarra, and 2,000 shares to Colarelli).   Just a few months after the company's incorporation, Colarelli also became the Secretary of CCI.   Dkt. No. 98-11 at 2.   Of relevance here, this title gave Colarelli the authority to "enter into any contract or execute and deliver any instrument, in the name of and on behalf of [the] Corporation, which [he] deem[s] necessary and expedient."   Dkt. No. 98-8 at 4.

## I.      Contracts

The four contracts at issue in this case were executed in January and February of 2015.   Dkt. Nos. 1-1, 1-2, 1-3, 1-4.   First, CCI and Lewis executed the MIP Agreement, whereby Lewis agreed to sell his interest in Lewis Electric to CCI for $185,000, with Adam Ibarra signing on behalf of CCI.   Dkt. No. 1-1. Second, CCI, with Adam Ibarra again as signatory, issued Lewis a Promissory Note for $185,000, plus five percent annual interest, to be paid in full by December 31, 2018.   Dkt. No. 1-2.   Third, pursuant to the MIP Agreement, Dkt. No. 1-1 at ¶2.4(a)(iii), Lewis entered into an employment agreement with Lewis Electric, with Adam Ibarra signing on behalf of Lewis Electric.   Dkt. No. 1-3.   Finally, Adam Ibarra entered into a Side Agreement with Lewis, whereby he agreed to give Lewis 40 percent of Lewis Electric's net revenue (*i.e.*, 50 percent of his and Mary's share of the net revenue) per annum up to $1.4 million, at which point revenue sharing would cease.   Dkt. No. 1-4.

## II.     Lewis Electric's Insolvency

Prior to CCI acquiring Lewis Electric, Lewis alleges it was a successful company, with an appraised value of $3.7 million and approximately $60 million of work under contract.   Dkt. No. 1 at 3; *see also* Dkt. No. 97 at 3 (alleging Lewis Electric did "somewhere in the neighborhood of $85 million in business over a seven-year span").   Colarelli disputes this assessment, claiming Lewis Electric's

true value when sold to CCI was $185,000 and much of the claimed "work under contract" was speculative.   Dkt. No. 82 at 8–9.[2]

CCI acquired all interest in Lewis Electric in February 2015.   Dkt. No. 1 at 3; Dkt. No. 1-1; Dkt. No. 56 at 2.   In May 2015, Colarelli registered Lewis Electric as an LLC with the State of Hawaii, signing the forms on behalf of CCI as its Vice President.   Dkt. No. 98-17; Dkt. No. 98-18.   Around the same time, he opened a bank account on behalf of Lewis Electric.   Dkt. No. 98-19; *see also* Dkt. No. 98-18 (email chain from bank indicating Colarelli's approval was needed to "open the accounts" for Lewis Electric).

Several months later, in November 2015, Lewis Electric was unable to make payroll, with payroll checks denied due to insufficient funds.   Dkt. No. 97 at 3; Dkt. No. 98-2 at 2.   An investigation revealed the source of the problem: up to $786,516 had been removed from Lewis Electric's accounts for "unexplained reasons."   Dkt. No. 1 at 5 (claiming $679,000 was transferred from Lewis Electric's accounts to "pay debts owed by other entities under Colarelli's and Adan Ibarra's control"); Dkt. No. 98-2 at 2 (Wallace Beatty, Lewis Electric's former Chief Operating Officer, claiming "$786,516 had been taken from Lewis Electric

---

[2]There is no evidence in the present record, other than the word of Lewis and Colarelli, to support either of their assessments of Lewis Electric's value when it was sold to CCI.

accounts for unexplained reasons"); Dkt. No. 98-24 (Lewis Electric's bank records).[3]

Allegedly, more than $500,000 of the "unexplained" transfers went to B&B Solvent Inc. ("B&B Solvent").   Dkt. No. 98-1 at 2 (Eugene Chong, Accounting Manager at Lewis Electric, claiming "over $500,000 had been transferred . . . to B&B Solvent without any explanation"); *see also* Dkt. No. 98-2 at 2; Dkt. No. 98-24.   At the time of the fund transfers, the Ibarras and Colarelli served as B&B Solvent's executives and managers.[4]   Dkt. No. 98-15 (amended articles of incorporation listing the Ibarras and Colarelli as directors of B&B Solvent, Adam Ibarra as President, and Colarelli as Vice President, Secretary, and Treasurer).

Lewis alleges that B&B Solvent and Lewis Electric—other than sharing an owner (CCI) and managers (the Ibarras and Colarelli)—had no business relationship and, thus, there was no legitimate business purpose for the fund transfers between the two companies.   Dkt. No. 97 at 3–4; Dkt. No. 98-1 at 2; Dkt. No. 98-2 at 2.   Lewis avers that Adam Ibarra told him the transfers to B&B Solvent were "directed by Vince Colarelli so that debts owed by B&B Solvent for

---

[3]The exact number is hard to discern from the record, *see* Dkt. No. 98-24, because, other than the fund transfers to B&B Solvent Inc. that Lewis claims were made without a legitimate business purpose, the Court has no way of assessing the legitimacy of the other transactions reflected in Lewis Electric's bank records.

[4]Lewis and Colarelli dispute whether CCI was B&B Solvent's sole shareholder.   *See* Dkt. No. 98 at 13; Dkt. No. 100 at 7.   This fact, however, is immaterial for purposes of this motion because, as the only directors and officers of B&B Solvent, the Court assumes the Ibarras and Colarelli controlled the company.

heavy equipment leases could be paid."   Dkt. No. 98-3 at 2; *see also* Dkt. No. 98-25 at 3 (a 2017 settlement agreement between B&B Solvent, Adam Ibarra, Colarelli and a third party promising Lewis Electric would pay a portion of the debt still owed by B&B Solvent on equipment leases).

The transfers of funds from Lewis Electric's accounts had a deleterious effect on business: employees started to quit or were let go and several of Lewis Electric's contracts had to be canceled because it could not guarantee payment of its workers.   Dkt. No. 1 at 5; Dkt. No. 97 at 5; Dkt. No. 98-2 at 3.   As for Lewis, to date, he alleges he has received just $94,124.95 ($83,391.26 in principal and $10,733.69 in interest) on the Promissory Note with no payments made since June 20, 2016.   Dkt. No. 1 at 4.   Further, he alleges Lewis Electric has failed to pay his salary since June 20, 2016, "even though he worked there until July 21, 2017."   *Id.* Finally, Lewis claims he has received no payment pursuant to his Side Agreement with Adam Ibarra.[5]   *Id.* at 7–8.   Colarelli does not dispute the allegations concerning payments to Lewis but pleads insufficient knowledge as to their veracity.   Dkt. No. 56 at 5.

---

[5]Lewis' claim concerning breach of the Side Agreement does not implicate Colarelli.   *See* Dkt. No. 1 at 7 ¶ 42 (claiming Adam Ibarra breached the Side Agreement); *see also* Dkt. No. 1 at ¶¶24–25 (alleging Mary Ibarra was aware of the Side Agreement and helped her son, Adam Ibarra, breach it by aiding him in hiding assets).

### III.   **Procedural History**[6]

Lewis filed this action on October 3, 2019, asserting the following five counts under Hawaii law: (1) "CCI, through . . . [Adam] Ibarra and Colarelli,"' breached the MIP Agreement (2) "Lewis Electric, through . . . [Adam] Ibarra and Colarelli," breached the Employment Agreement; (3) Adam Ibarra breached the Side Agreement; (4) "CCI, through . . . [Adam] Ibarra and Colarelli," breached the Promissory Note; and (5) breach of the implied covenant of good faith.   Dkt. No. 1, ¶¶ 30, 36, 42, 48, 51–52.   After Colarelli's motion to dismiss was denied, Dkt. No. 46, he answered Lewis' complaint on April 21, 2020, Dkt. No. 56.   To date, the Ibarras, CCI, and Lewis Electric have failed to file any responsive pleading. While default has been entered against CCI and Lewis Electric, default judgment was denied on February 6, 2020, Dkt. Nos. 19, 39, after Colarelli, through M. James Zendejas, Esq., opposed the motion for default judgment, Dkt. No. 37.

Colarelli, through Zendejas, filed a motion for summary judgment on November 19, 2020.   Lewis filed an opposition on January 15, 2021, to which Colarelli replied on January 22, 2021.   This order follows.

---

[6]A detailed procedural history of the service issues pertaining to the Ibarras appears in the Court's order denying Defendant Colarelli's motion to dismiss.   Dkt. No. 46 at 5–7, *Lewis v. Lewis Electric LLC*, 2020 WL 1694470 *2–*3 (D. Haw. Apr. 7, 2020).   That history need not be repeated here.

## STANDARD OF REVIEW

### I.   Motion for Summary Judgment

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.   A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"   *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In evaluating a motion for summary judgment, the Court construes all evidence and reasonable inferences therefrom in the light most favorable to the nonmoving party.   *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).   Thus, the moving party bears the burden of persuading the court as to the absence of a genuine dispute of material fact.   *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).   If the moving party satisfies its burden, the nonmoving party must set forth "significant probative evidence" demonstrating such a genuine dispute exists.   *T.W. Elec. Serv.*, 809 F.2d at 630 (citation and internal quotation marks omitted).   "A party asserting that a fact cannot be or is genuinely disputed must support the assertion," and can do so by

8

either "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

## DISCUSSION

The material fact at issue in this motion is clear: did Colarelli operate as the alter ego of CCI and, by extension, Lewis Electric, treating the businesses as mere instrumentalities to pursue his separate and/or personal interests?   Because, based on the record before the Court, a reasonable jury could conclude that he did, summary judgment is inappropriate, and Colarelli's motion is DENIED.[7]

## I.   Legal Framework: Alter Ego Liability

To determine alter ego liability, the Court applies the law of the forum state.[8]   *In re Schwarzkopf*, 626 F.3d 1032, 1037 (9th Cir. 2010).   In Hawai'i, the alter ego doctrine allows courts to "look past a corporation's formal existence" to hold "controlling individuals liable for 'corporate' obligations" when the "corporation is the mere instrumentality or business conduit of another corporation or person."   *Robert's Haw. Sch. of Bus. v. Laupahoehoe Transp. Co., Inc.*, 982 P.2d 853, 867 (Haw. 1999) (citation and internal quotation marks omitted),

---

[7]The Court passes no judgment on whether Colarelli, in fact, operated as the alter ego of these companies; it only finds that the record is equivocal as to that fact.

[8]Lewis and Colarelli appear to agree that Hawai'i state law applies to Lewis' breach of contract claims.   *See* Dkt. No. 82 at 4–5; Dkt. No. 97 at 11.

*superseded by statute on other grounds as noted in Davis v. Four Seasons Hotel Ltd.*, 228 P.3d 303, 308 n.9 (Haw. 2010).

To pursue an alter ego theory of liability, a plaintiff must show: (1) a "corporation is not only influenced and governed by [a] person, but that there is such a unity of interest . . . that the individuality, or separateness, of such person and corporation has ceased"; and (2) "an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice." *Calipjo v. Purdy*, 439 P.3d 218, 229 (Haw. 2019) (quoting *Robert's*, 982 P.2d at 871, 882).   The first prong has two elements (1) control over the corporate entity; and (2) unity of interest between the individual and the corporate entity. *See id.* "[C]ontrol is determined by the actual relationship of the parties" and "exclusive ownership and control are not solely determinative of whether [a court] should disregard the corporate entity." *Robert's*, 982 P.2d at 872.   A "unity of interest" means "their general corporate actions are guided or determined not by two separate . . . consciousness[es], but one." *Id.* at 229–30.

The Hawaii Supreme Court has identified a non-exhaustive list of twenty-five factors to guide courts in evaluating whether an individual or corporate entity is operating as the alter ego of another such entity.[9] *Robert's*, 982 P.2d at 871–73;

---

[9]These factors include:

*accord Calipjo*, 439 P.3d at 229 n.23.   No one factor is dispositive.   *Robert's*, 982

P.2d at 872.

---

[1] Commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses; [2] the treatment by an individual of the assets of the corporation as his own; [3] the failure to obtain authority to issue stock or to subscribe to or issue the same; [4] the holding out by an individual that he is personally liable for the debts of the corporation; [5] the identical equitable ownership in the two entities; [6] the identification of the equitable owners thereof with the domination and control of the two entities; [7] identity of . . . directors and officers of the two entities in the responsible supervision and management; [8] sole ownership of all of the stock in a corporation by one individual or the members of a family; [9] the use of the same office or business location; [10] the employment of the same employees and/or attorney; [11] the failure to adequately capitalize a corporation; [12] the total absence of corporate assets, and undercapitalization; [13] the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; [14] the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities; [15] the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; [16] the use of the corporate entity to procure labor, services or merchandise for another person or entity; [17] the diversion stockholder [sic] or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another; [18] the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions; and [19] the formation and use of a corporation to transfer to it the existing liability of another person or entity.

*Robert's*, 982 P.2d at 871 (alterations in original; emphasis omitted) (quoting *Associated Vendors, Inc. v. Oakland Meat Co.*, 26 Cal. Rptr. 806, 838–40 (Cal. Dist. Ct. App. 1962)).   The court noted other factors, including:

(1) incorporation for the purpose of circumventing public policy or statutes; (2) whether the parent finances the subsidiary; (3) whether the subsidiary has no business or assets except those conveyed to it by the parent; (4) whether the parent uses the subsidiary's property as its own; (5) whether the directors of the subsidiary do not act independently in the interest of the corporation but take their orders from and serve the parent; and (6) whether the "fiction of corporate entity . . . has been adopted or used to evade the provisions of a statute."

*Id.* (quoting *Kavanaugh v. Ford Motor Co.*, 353 F.2d 710, 717 (7th Cir. 1965)).

"Generally speaking, the question of whether a corporation is a mere agency, instrumentality, or alter ego of another corporation or individual is one of fact." *Robert's*, 982 P.2d at 867 (citing William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 41.95, at 699–705 (perm. ed.1999)).   Thus, the determination of whether alter ego liability exists should not ordinarily be made at summary judgment.   *Robert's,* 982 P.2d at 867 (citation omitted); *Television Events & Mktg., Inc. v. AMCON Distributing Co.,* 484 F. Supp. 2d 1124, 1143 (D. Haw. 2006) (the court "[a]cknowledg[es] the reluctance of Hawaii courts to make determinations regarding alter ego liability at the summary judgment stage").   Nonetheless, summary judgment may be appropriate where all material facts are undisputed and, thus, there is no genuine issue of fact.   *Robert's,* 982 P.2d at 867 (citation omitted).

## II.   Applying Alter-Ego Liability to this Case

Colarelli rests his argument on the first prong of the alter ego analysis.   *See* Dkt. No. 82.   He insists he was a virtually silent investor in CCI who had a ceremonial title but no decision-making authority, and who, in fact, exercised no authority on behalf of CCI, let alone Lewis Electric.   *See generally* Dkt. Nos. 82, 82-2, 83.   But this argument is belied by incorporation, organizational, and other company documents.   Colarelli was one of three Board members for CCI, which was the sole owner and manager of Lewis Electric.   In addition to serving on the

12

Board, Colarelli was CCI's Vice President, Secretary, and Treasurer, as well as the Vice President, Secretary, and Treasurer of B&B Solvent, to which Lewis Electric transferred significant funds for questionable reasons.   Moreover, it appears Colarelli's titles were anything but ceremonial; he had the authority to act—and did act—on behalf of all three organizations.   Because there are genuine issues of material fact as to Colarelli's precise role in managing CCI and Lewis Electric—*e.g.* whether for legitimate business purposes or not—Colarelli's motion for summary judgment is DENIED.

### A.   Colarelli and CCI

#### i.   Colarelli's Authority Within CCI

Colarelli claims he was nothing more than a passive minority shareholder in CCI.   Dkt. No. 82 at 2, 5–6.   To support this conclusion, the "evidence" Colarelli presents is, ultimately, his own declaration.   *See* Dkt. No. 83-2 (Colarelli's affidavit in support of his motion for summary judgment).   For example, he claims: (1) "I did not have authority to enter contracts on behalf of CCI [and] I never signed any contracts for CCI," *id.* at ¶¶ 10, 11; (2) "I was never involved in the management of CCI," *id.* at ¶ 20; (3) "I was given the title of vice-president, but it was a meaningless title," *id.* at ¶ 4; (4) "I did not have authority to write checks [or] direct how money was spent," *id.* at ¶¶ 5–6; (5) "I never had the ability

or authority to direct or control . . . CCI accounts."), *id.* at ¶ 31; and (6) "I was never an executive or manager of CCI," *id.* at ¶ 65.

These self-serving representations, however, are directly refuted by the incorporation, organizational, and other corporate documents that are part of the present record.   For example, the incorporation and organizational minutes list Colarelli as one of the three directors of CCI.   Dkt. No. 98-6 at 5; Dkt. No. 98-8. Pursuant to CCI's bylaws, "[t]he business and affairs of the Corporation shall be managed by (or under the direction of) its Board of Directors."   Dkt. No. 98-7 at 9.   Further, certain business decisions could not be made without Colarelli's consent, *see* Dkt. No. 98-9 at 1–2, contradicting his assertion that all of CCI's activities were a result of "Mr. Ibarra acting on his own," Dkt. No. 82-2 at ¶ 20.

While Colarelli concedes he held the title of Vice President, he fails to disclose that he also served as CCI's Secretary and Treasurer.   Dkt. No. 98-8 at 2 (listing Colarelli as Vice President and Treasurer in September 2014); Dkt. No. 98-11 (listing Colarelli as Vice President, Secretary, and Treasurer in January 2015). As the Secretary, Colarelli could "enter into any contract or execute and deliver any instrument, in the name of and on behalf of [CCI]" when he "deem[ed] necessary or expedient."   Dkt. No. 98-8 at 4 (conferring this authority on "the President and the Secretary or any agent authorized by them").   And, as Treasurer, Colarelli was authorized "to do any and all things necessary in order to conduct

banking for the Corporation."   Dkt. No. 98-8 at 3.   Clearly, these corporate documents show Colarelli had the authority to participate in and conduct at least some, if not all, of the "business and affairs" of CCI.

Moreover, the record, at minimum, supports the contention that Colarelli's authority was not hypothetical: he, in fact, controlled—or at least participated in—certain CCI business affairs and was not merely an investor.   Eugene Chong, a former Accounting Manager at Lewis Electric, observed that "Ibarra constantly went to Vince Colarelli for approval regarding business decisions, particularly anything that involved company finances."   Dkt. No. 98-1 at 1–2.   Wallace Beatty, Lewis Electric's former Chief Operating Officer, likewise observed that "Colarelli was the top ultimate authority for business decisions at Lewis Electric and CCI and was in charge of the entire CCI organization."   Dkt. No. 82-2 at 1, 3.[10]   Thus, there is sufficient evidence to find Colarelli controlled CCI.

### ii.    Applying the *Robert's* Factors

The Court need not address each *Robert's* factor to determine that a genuine issue of material fact remains as to whether alter ego liability may be appropriate.

---

[10]Colarelli objects to these statements as lacking foundation and derived from hearsay.   Dkt. No. 100 at 2, 4, 6.   While the Court agrees that the submitted statements, including that Colarelli was "in charge of the entire CCI organization," may be overbroad and thus lack certain foundation, these Lewis Electric employees' personal observations interacting with CCI, Adam Ibarra, and Colarelli give them sufficient foundation from which to share their impressions of how decisions were made between Ibarra and Colarelli within CCI.   To that extent, Colarelli's evidentiary objections are overruled.

A few examples suffice.   Colarelli admits to "loaning" $1,000,000 to CCI.   Dkt.

No. 82-2 at 6.   But Colarelli has produced no documentation demonstrating this

"loan" was formalized or memorialized in any way.   The absence of an arm's

length transaction, viewed in the light most favorable to Lewis, suggests Colarelli

simply "commingled" his own funds with those of CCI.   *See Robert's*, 982 P.2d at

871 (factor 1).   In addition, CCI's failure to pay on the Promissory Note, *see* Dkt.

No. 1 at 4, suggests "significant undercapitalization in light of the relatively

modest sum owed," Dkt. No. 97 at 16.   *See Robert's*, 982 P.2d at 871 (factors 11

and 12).

The same attorney represented CCI and Colarelli in their business affairs and

has represented both Colarelli and CCI in this very suit.   *See Robert's*, 982 P.2d at

871 (factor 10); *see also* Dkt. No. 98-6 (Zendejas' law firm filed incorporation

documents); Dkt. 98-8 at 5 (CCI's organizational minutes stating Zendejas' firm

was "employed to perform and provide" legal services to CCI).   Curiously,

Zendejas' firm appears to have worked on behalf of Colarelli, even when the work

related to CCI's affairs.   Dkt. No. 98-9 at 2 (law firm developed CCI's voting

agreement "for Vince [Colarelli] only").   In this case, when Lewis sought a

default judgment against CCI, Colarelli, through Zendejas' firm, defended the

motion in Colarelli's *individual* capacity, and not as an executive or officer of CCI.

16

*Id.*   This background suggests a significant entanglement of interests between Colarelli and CCI.

On the other hand, there are several factors suggesting Colarelli was not operating as an alter ego of CCI.   It appears CCI was not "a mere shell, instrumentality or conduit for a single venture."   *See Robert's*, 982 P.2d at 871 (factor 13).   There is some evidence to support Colarelli's claim that "CCI did not operate solely to purchase Lewis Electric."   *See* Dkt. No. 98-20 (showing an organizational chart of CCI's various business interests).   Colarelli alone (or with family members) did not have sole ownership in CCI.   *See Robert's*, 982 P.2d at 871 (factor 8).   Rather, he held a 20 percent interest, while Adam Ibarra held the majority interest.[11]   Dkt. No. 98-11 at 1–2; *see also* Dkt. No. 98-16 at 1.   Further, that Adam Ibarra alone signed each of the contracts at issue in this suit and served as CCI's President, at minimum, suggests Adam Ibarra, not Colarelli, controlled CCI, at least in part.   Dkt. Nos. 1-1, 1-2, 1-3, 1-4.

Simply put, the evidence cuts both ways.[12]   As such, a genuine issue of material fact remains rendering summary judgment inappropriate.

---

[11]However, holding a minority share or sharing control over a corporate entity, while instructive, is not dispositive as to whether an individual may be held liable under an alter ego theory.   *See Robert's*, 982 P.2d at 872 ("exclusive ownership and control are not solely determinative of whether [a court] should disregard the corporate entity").

[12]This is not to suggest the evidence cuts *equally* both ways.   But it is not within the Court's purview to weigh the evidence at the summary judgment stage.

**B.     Colarelli and Lewis Electric**

      **i.     Colarelli's Authority Within Lewis Electric**

Similar to his claims concerning CCI, Colarelli avers he had no role whatsoever in managing Lewis Electric.   Dkt. No. 82-2 at ¶ 31 ("I never used Lewis Electric's accounts [or] had the ability or authority to do so"); *id.* at ¶ 46 ("I never had dominion or control of any aspect of . . . Lewis Electric"); *id.* at ¶ 65 ("I was never an executive or manager of . . . Lewis Electric").   Again, company documents as well as the assertions of former Lewis Electric employees belie Colarelli's representations.

Colarelli, as Vice President of CCI, signed Lewis Electric's LLC registration paperwork.   Dkt. No. 98-17.   The registration documents show Lewis Electric is a "manager-managed" LLC, with just one named manager, CCI.   Dkt. No. 98-17 at 8.   As Vice President, Secretary, and Treasurer of CCI, the sole member and manager of Lewis Electric, it is clear Colarelli at least had the authority to manage some, if not all, of Lewis Electric's business affairs.   Certainly, without a copy of Lewis Electric's bylaws or management agreement—neither of which appears in the record—stating otherwise, there is no reason for the Court to find he did not.

Like his authority to act on behalf of CCI, Colarelli's ability to act on behalf of Lewis Electric was not hypothetical.   Not only did he sign Lewis Electric's LLC registration paperwork, but in the course of opening a bank account for Lewis

18

Electric, Colarelli indicated that he was "designated to act on behalf of Lewis Electric LLC."   Dkt. No. 98-19 at 5.   Finally, Lewis alleges that Adam Ibarra told him the "unexplained" transfers of funds from Lewis Electric's account to B&B Solvent were "directed by Vince Colarelli."   Dkt. No. 98-3 at 2.

The Court has just Colarelli's word that he had no role in managing Lewis Electric; but these records and other information show he at least had the authority to do so, and, at least on occasion, exercised that authority.   Put simply, it strains credulity to believe Colarelli had *no* control over or role in managing Lewis Electric when the only documents in the record concerning that company—its LLC registration and bank account application—were signed by Colarelli, as agent of CCI.[13]

### ii.     Applying the Robert's Factors

Again, the Court need not address each *Robert's* factor to determine that a genuine issue of material fact remains as to whether Colarelli operated as the alter ego of Lewis Electric.   A few examples suffice.   There is identical equitable ownership between Lewis Electric and CCI whereby the same persons (the Ibarras and Colarelli) have "dominion and control of the two entities."   *See Robert's*, 982

---

[13]The Court, once again, passes no judgment on the extent of Colarelli's role in the management of Lewis Electric or whether his actions on the company's behalf were taken for legitimate business purposes.   It finds only that the record supports a jury finding that he had control of and a role in managing the company, contrary to his representations otherwise.

P.2d 871 (factors 6, 7).   CCI holds 100 percent of the membership interest in Lewis Electric and is the sole manager of company.   Dkt. No. 98-17 at 8, 17.

The use of Lewis Electric's assets to settle debts of another one of CCI's holdings is proof positive of CCI's—and its owners—control over Lewis Electric. The record supports finding that Lewis Electric's funds were put to purposes "other than corporate use."   *See Robert's*, 982 P.2d 871 (factor 1).   Up to $786,516 was removed from Lewis Electric's accounts for "unexplained reasons," with over $500,000 going to B&B solvent.   Dkt. No. 1 at 5, Dkt. No. 98-1 at 2; Dkt. No. 98-2 at 1; Dkt. No. 98-24.   The Ibarras and Colarelli are the only named executives and managers of B&B Solvent, leaving little doubt as to their control over that company.   Dkt. No. 98-15.

Lewis avers that Adam Ibarra told him the transfers to B&B Solvent were "directed by Vince Colarelli so that debts owed by B&B Solvent for heavy equipment leases could be paid."   Dkt. No. 98-3 at 2; *see also* Dkt. No. 98-24 (showing fund transfers from Lewis Electric to B&B Solvent).   This contention, while arguably hearsay, has at least some independent support in the record. When B&B Solvent in 2017 settled a dispute with a third party over equipment leases—for which Colarelli appears to have been a personal guarantor—Adam

Ibarra and Colarelli committed *Lewis Electric* to paying some of the outstanding debt owed by *B&B Solvent*.   Dkt. No. 98-25.[14]

There is evidence that the unexplained removal of funds from Lewis Electric led to the undercapitalization of the organization.   *See Robert's*, 982 P.2d 871 (factor 11).   In November 2015, only months after the transfer of funds out of Lewis Electric's accounts, Lewis Electric could not make payroll and, as a result, employees left the company or were let go, resulting in lost business opportunities. Dkt. No. 1 at 5; Dkt. No. 97 at 5; Dkt. No. 98-2 at 3.   Apparently, the depletion of Lewis Electric's funds has also rendered it unable to make any salary payments to Lewis since June 20, 2016.   Dkt. No. 1 at 4.

Finally, Zendejas' firm, which represented both CCI and Colarelli in their business affairs and has represented them in this suit, was also employed to perform legal work and receive legal process for Lewis Electric.   *See Robert's*, 982 P.2d at 871 (factor 10).   Zendejas' firm filed the LLC registration paperwork for Lewis Electric, Dkt. No. 98-17, and opposed the entry of default judgment against Lewis Electric earlier in this case, all while identifying itself as counsel for Colarelli.   This presents an issue because, as the Court has explained, "the lynchpin in the 'unity of interest' between Colarelli and Lewis Electric is the fact

---

[14]There is no evidence Lewis Electric was a party to or beneficiary of those equipment leases. *See* Dkt. No. 98-25.   Nor has Colarelli offered any information concerning the purpose of this transfer of funds to B&B Solvent, leaving Lewis' explanation unrebutted.

that when Lewis moved for a default judgment *against Lewis Electric*[,] Colarelli opposed the motion *in his individual capacity*. . . Colarelli cannot stand in the shoes of Lewis Electric and then seriously maintain the façade of a separate existence." Dkt. No. 46 at 14. None of the evidence produced by Colarelli on summary judgment changes the Court's conclusion that the relationship between Colarelli, Lewis Electric, and their shared law firm suggests a significant entanglement of interests.

As with CCI, the Court acknowledges that there are facts suggesting Colarelli did not operate as an alter ego of Lewis Electric. By Lewis' own account, Lewis Electric was a legitimate business and was not "a mere shell, instrumentality or conduit for a single venture." *See Robert's*, 982 P.2d at 871 (factor 13); *see also* Dkt. No. 1 at 4–5. Colarelli alone (or with family members) did not have sole ownership in Lewis Electric. *See Robert's*, 982 P.2d at 871 (factor 8). And the extent of Colarelli's control over Lewis Electric is unclear. Although Colarelli helped open a bank account for Lewis Electric, he is listed on the bank forms as a member of the organization and not as an authorized signer on the account. Dkt. No. 98-19 at 5. And Adam Ibarra, not Colarelli, signed the Employment Agreement on behalf of Lewis Electric, adding further evidence that, if anyone controlled Lewis Electric, it was Adam Ibarra. Dkt. No. 1-2.

## <u>CONCLUSION</u>

Based on the record before the Court, a rational trier of fact could find

Colarelli controlled CCI and Lewis Electric, that those companies and Colarelli

shared a unity of interest, and injustice would be done by continuing to observe the

corporate form.   That is not to say that a rational trier of fact could not find to the

contrary.   But that both findings are supported by the record is proof that a

genuine issue of material fact remains.   For the reasons set forth herein, Colarelli's

motion for summary judgment, Dkt. No. 82, is DENIED.

IT IS SO ORDERED.

Dated: February 1, 2021 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

---

*Lewis v. Lewis Electric LLC, et al.*, Civil No. 19-00527-DKW-KJM; **ORDER DENYING DEFENDANT COLARELLI'S MOTION FOR SUMMARY JUDGMENT**