IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LEE LEWIS,<br><br>        Plaintiff,<br><br>    vs.<br><br>LEWIS ELECTRIC, LLC; CCI, INC.;<br>ADAM IBARRA; MARY IBARRA;<br>and VINCE COLARELLI,<br><br>        Defendants. | Case No. 19-cv-527-DKW-KJM<br><br>**ORDER (1) GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST CCI, INC. AND LEWIS ELECTRIC, LLC AND (2) DENYING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST ADAM AND MARY IBARRA** |

Plaintiff Lee Lewis seeks default judgment against the two company

Defendants—CCI, Inc. ("CCI") and Lewis Electric, LLC ("Lewis Electric")—for

failing to pay money owed to him under two contracts.  Lewis also seeks default

judgment against two of the companies' owners—Adam (aka Adan) Ibarra

("Adam") and Mary Ibarra ("Mary") (collectively, "the Ibarras")—under an alter

ego theory.[1]  The Court GRANTS Lewis' motion for default judgment against CCI

and Lewis Electric but not the Ibarras.  As explained below, Lewis' evidence

supporting his alter ego theory is not sufficient under Hawai'i law to hold the

Ibarras personally liable for the companies' debts.

---

[1]On October 1, 2021, Lewis' claims against the fifth Defendant, Vince Colarelli ("Colarelli"), were dismissed with prejudice pursuant to a settlement agreement.  *See* Dkt. Nos. 158, 161.

## LEGAL STANDARD

A court may enter default judgment for a plaintiff if the defendant has defaulted and the claim is for a "sum certain."  Fed. R. Civ. P. 55.  The decision to grant default judgment lies within the court's discretion.  *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986).  In making that decision, courts weigh seven factors:

> (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Id.* at 1471–72.  Further, "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true."  *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987); *Fair Hous. Of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002) (plaintiff must provide proof of damages).

## RELEVANT BACKGROUND

### I.    The Sale Contracts

Effective February 16, 2015, Lewis sold his company, Lewis Electric, to CCI, which was 80% owned by the Ibarras.[2]  Dkt. No. 163-1 at 5.

The sale was seller-financed: pursuant to a Membership Interest Purchase Agreement (the "MIPA"), Dkt. No. 1-1, Lewis agreed to transfer his 100%

---

[2]Adam owned 61% of CCI, and Mary owned 19%.  Dkt. No. 163-1 at 10.  Colarelli owned the other 20%.  *Id.*

membership interest in Lewis Electric to CCI in exchange for a Promissory Note (the "Note"), Dkt. No. 1-2, in which CCI promised to pay Lewis $185,000.00 plus five percent annual interest, by December 31, 2018.  Dkt. No. 1-1 ¶ 7; Dkt. No. 1-2 at 1, 17, 21.  Adam signed the MIPA and Note on behalf of CCI.  Dkt. Nos. 1-1 at 50; 1-2 at 20.

Pursuant to Exhibit 2.4(a)(ii) of the MIPA, Lewis and Lewis Electric, under its new ownership, also entered into an Employment Agreement ("EA").  Dkt. No. 1-3.  In the EA, Lewis agreed to continue working for Lewis Electric at a salary of $175,000.00 with annual three percent increases,[3] repayment of preauthorized business expenses, and the potential for performance bonuses based on Lewis Electric's future growth and profit.  Dkt. No. 1-3 at 3, 14.  Adam signed the EA on behalf of Lewis Electric.  *Id.* at 13.[4]

## II. Lewis Electric's Insolvency

Prior to the sale, Lewis claims that Lewis Electric was a profitable business with an appraised value of $3.7 million, having done roughly $85 million in work over a recent seven-year span.  Dkt. No. 1 ¶ 19; Dkt. No. 163-4, Declaration of

---

[3]With the annual 3% increases, Lewis' salary would rise to $180,250.00 in February 2016 and $185,657.50 in February 2017.

[4]In a separate Side Agreement dated January 27, 2015, Dkt. No. 1-4, Lewis and Adam agreed that Lewis would "relinquish the corporate line of credit of Lewis Electric in exchange for 50% of Adan Ibarra & Mary Ibarra['s] share of [the] net revenue in Lewis Electric" up to a maximum of $1.4 million.  Dkt. No. 1-4.  Lewis claims he has received $0 pursuant to the Side Agreement, Dkt. No. 1 ¶ 23 but does not assert a claim pursuant to the Side Agreement in this Motion.

Wallace Beaty ("Beaty Decl.") ¶ 3.  After the sale, Lewis avers that the new owners rendered Lewis Electric insolvent in bad faith—by unjustifiably transferring large sums out of Lewis Electric's accounts to support other companies they owned—resulting in their inability to fulfill their obligations under the sale contracts.  Dkt. No. 1 ¶¶ 7–9.  Specifically, Lewis alleges:

- In November 2015, Lewis Electric's Chief Operating Officer, Wallace Beaty, learned that Lewis Electric's payroll checks were being denied for insufficient funds.  Beaty Decl. ¶ 4.

- Upon investigating what had led to the lack of funds, Beaty discovered that over $786,516.00 had been transferred out of Lewis Electric's accounts for unexplained reasons, including large sums to a company called B&B Solvent ("B&B").  *Id.* ¶¶ 4–5.

- Beaty asked Adam and Colarelli about the funds transfers and "[t]hey explained that various entities, including Lewis Electric, B&B Solvent, and CCI, were all part of the same big corporate structure so the transfers were not a problem.  They said that money was being taken out of Lewis Electric for now, but that eventually it might be put back in."  *Id.* ¶ 7.

- CCI, Lewis Electric, and B&B shared owners, directors, and corporate officers (the Ibarras and Colarelli), a corporate address (111 South Tejon Street, Suite 112, Colorado Springs, Colorado 80903), and attorneys and agents (Stinar Zendejas Gaither, LLC).  Dkt. No. 98-15.

- Other than sharing leadership, Lewis Electric and B&B had no business relationship.  Thus, "there was no legitimate business purpose for Lewis Electric to be making payments to B&B Solvent, especially in such large quantities."  Beaty Decl. ¶ 5.

- Beaty was terminated in February 2016.  *Id.* ¶ 10.

- From July 2016 until July 2017, Eugene Chong worked as Lewis Electric's Accounting Manager.  Dkt. No. 163-5, Declaration of Eugene

4

Chong ("Chong Decl.") ¶ 2.

- When Chong began working at Lewis Electric, he found the accounting papers in disarray. The company's general ledger had not been updated in over a year, which he thought highly irregular. *Id.* ¶ 3. While attempting to get the books in order, Chong discovered the large transfers from Lewis Electric to other companies, including over $500,000.00 to B&B. *Id.* ¶¶ 4–5. These transfers were made with no explanation or documentation. *Id.* ¶ 5.

- As a result of the funds transfers, Lewis Electric issued checks to employees that were returned for insufficient funds, key employees left the company, vendors could not be paid, and contracts were canceled. Dkt. No. 1 ¶¶ 20–21; Beaty Decl. ¶ 9 (providing an example of one such canceled contract for over $12M worth of work).

- After Lewis learned that Lewis Electric was not meeting its financial obligations because of the funds transfers, Adam told him the transfers were being made "so that debts owed by B&B Solvent for heavy equipment leases could be paid," and that Adam and Colarelli "owed the money and had to pay it even if it would bankrupt Lewis Electric." Dkt. No. 98-3, Declaration of Lee Lewis ("Lewis Decl.") ¶¶ 3–5; *see also* Dkt. No. 163-10 at 3 (a 2017 settlement agreement between B&B, Adam, Colarelli, and a third party, promising Lewis Electric would pay a portion of the B&B's equipment lease debt).

- Lewis Electric is now insolvent. Dkt. No. 1 ¶ 19.

## III.   Lewis' Claims and Prayer for Damages

First, Lewis claims CCI breached its contract by only paying $94,124.95 ($83,391.26 principal and $10,733.69 interest) on the $185,000.00 Note with all payments ceasing after June 20, 2016. Dkt. No. 163-1 at 7–8. Thus, he requests

compensatory damages from CCI in the amount of $101,608.74 in principal plus five percent interest, or $128,945.67.[5] *Id.* at 8.

Second, Lewis claims Lewis Electric breached its contract by failing to pay his salary and reimbursable business expenses under the EA from June 20, 2016 until July 21, 2017, even though he continued working there during that time. *Id.* He claims Lewis Electric owes him seven months of salary at the increased second-year contract rate of $180,250.00 from July 2016 through January 2017, or $105,145.83, and five months of salary at the increased third-year contract rate of $185,657.50 from February 2017 through June 2017, or $77,357.29, for a total of $182,503.12 in unpaid salary. *Id.* He also claims Lewis Electric owes him an additional $50,000.00 for unreimbursed business expenses. *Id.* Accordingly, he requests compensatory damages from Lewis Electric in the amount of $232,503.12.

Lewis also asserts these breach of contract claims against the Ibarras because they "treated corporate assets as [their] own and abused the corporate form," and thus should be held personally liable under an alter ego theory. *Id.* at 10.

---

[5]Lewis provides no calculation explaining how this figure was reached. As a result, the Court has performed its own. Since CCI's last payment at the end of June 2016, interest has been accruing on the outstanding $101,608.74 for five and a half years at the 5% contract rate. Using simple interest ($101,608.74 x 5% = $5,080.44 annually), that translates to $27,942.42 ($5.080.44 x 5.5 years) in outstanding interest for a total amount due of $129,551.16.

Finally, Lewis requests additional compensatory damages of $86,757.69 in prejudgment interest and consequential damages of $90,362.20 in attorneys' fees. *Id.* at 12. To support his prayer for prejudgment interest, Lewis says the interest has been accruing (at an unstated rate) since December 12, 2017, the day he first demanded the delinquent amounts from Defendants. *Id.* To support his prayer for attorneys' fees, he cites to Haw. Rev. Stat. § 607-14 and explains that the requested amount is 25% of the non-interest damages. *Id.* He provides no other legal or factual justification for these two figures. *See id.*

| Summary of Damages Requested: | |
|---|---|
| Note | $128.945.67 |
| EA (salary) | $182,503.12 |
| EA (business expenses) | $ 50,000.00 |
| Prejudgment interest | $ 86,757.69 |
| Attorneys' fees | $ 90,362.20 |
| Total | $538,568.68 |

## IV. Procedural History

On October 3, 2019, Lewis filed a Complaint asserting, *inter alia*, the two breach of contract claims against CCI, Lewis Electric, and the Ibarras. Dkt. No. 1 ¶¶ 9, 26–37, 44–49. On October 15, 2019, the company Defendants, CCI and Lewis Electric, were served through their shared registered agent, John M. Stinar, Esq. Dkt. Nos. 16–17. Neither company responded to the Complaint, and on November 7, 2019, the Court entered default against them. Dkt. No. 163-1 at 12;

7

Dkt. No. 19.[6]  Service of process was then attempted on the Ibarras numerous

times without success, Dkt. No. 34, resulting in subsequent service by publication

on March 12, 2020.  Dkt. No. 45.  Like the company Defendants, the Ibarras did

not respond to the Complaint, Dkt. No. 163-1 at 13, and on April 10, 2020, the

Court entered default against them.  Dkt. Nos. 51–52.

Now, Lewis moves for default judgment against the four defaulting

Defendants.  Dkt. No. 163.  None of them has opposed this Motion, and the Court

has elected to decide it without a hearing.  *See* Dkt. No. 164.

## DISCUSSION

### I.   Jurisdiction

Before granting a motion for default judgment, the Court has an affirmative

obligation to ensure it has subject matter jurisdiction over the action and personal

jurisdiction over the defendants.  *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).

### a.   Subject matter jurisdiction

The Court has diversity jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(a) because the parties are completely diverse and the amount in

---

[6]On December 6, 2019, Lewis moved for default judgment against the company Defendants.
Dkt. No. 22.  At the motion hearing on February 6, 2020, *see* Dkt. No. 39, the Magistrate Judge
denied the motion for default judgment without prejudice when all parties agreed that default
judgment was not yet appropriate since three non-defaulting defendants remained in the action—
Colarelli and the as-yet-unserved Ibarras.  *See Neilson v. Chang*, 253 F.3d 520, 532 (9th Cir.
2001) (explaining that in a multi-defendant case, the preferred practice is for the court to refrain
from granting default judgment against defaulting defendants until the claims can be adjudicated
on the merits against non-defaulting defendants).

controversy, $538,568.68, exceeds $75,000.  Lewis is a citizen of Hawai'i.  Dkt.

No. 163-1 at 15.  The Ibarras are citizens of Texas.  *Id.*  CCI is a citizen of

Colorado because its place of incorporation and principal place of business are

there.  *Id.*  Lewis Electric is a citizen of Colorado because its place of incorporation

is there and because it has no principal place of business, having been rendered

insolvent by the time the Complaint was filed.  Dkt. No. 1 ¶¶ 2, 19, 22; *see Grupo*

*Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570 (2004) (court's jurisdiction

depends on the situation at the time of filing).

### b.   Personal jurisdiction

A federal court has personal jurisdiction over a party if (1) the state in which

it sits would have personal jurisdiction over the party, and (2) jurisdiction comports

with due process.  *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008).

Hawai'i's long-arm statute, Haw. Rev. Stat. §§ 634–35, authorizes personal

jurisdiction over defendants to the full extent permitted by the U.S. Constitution.

*Cowan v. First Ins. Co.*, 608 P.2d 394, 399 (Haw. 1980).  As a result, the Court

only needs to determine whether jurisdiction comports with due process.

For due process to be satisfied, a non-resident defendant must have

"minimum contacts" with the forum state such that assertion of jurisdiction "does

not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v.*

*Washington*, 326 U.S. 310, 316 (1945).  As relevant here, one way to establish "minimum contacts" is specific jurisdiction.[7]

Specific jurisdiction, also known as case-linked jurisdiction, exists when (1) the defendant "purposefully avails itself of the privilege of conducting activities within the forum State," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), and (2) the plaintiff's claims "arise out of or relate to the defendant's contacts with the forum." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 137 S. Ct. 1773, 1780 (2017).  Purposeful availment means "the defendant deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there."  *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)).

### i.    CCI and Lewis Electric

The Court has specific jurisdiction over CCI and Lewis Electric for Lewis' breach of contract claims because both companies purposefully availed themselves of the privileges of conducting activities in Hawai'i, and Lewis' claims arise out of these activities.  In 2015, CCI bought Lewis Electric—at the time, a Hawai'i

---

[7]Another way to establish personal jurisdiction is so-called tag jurisdiction—when an individual defendant is personally served within the geographical boundaries of the forum state.  *Burnham v. Superior Ct. of Cal.*, 495 U.S. 604, 622 (1990).  However, there is no tag jurisdiction equivalent for company defendants.  Thus, contrary to Lewis' suggestion, *see* Dkt. No. 163-1 at 15, personal service on the agent representative of CCI and Lewis Electric did not establish personal jurisdiction over the companies.

LLC—from Lewis, a Hawai'i resident.  Pursuant to the sale contracts, CCI and Lewis Electric agreed to (and did) continue operating in Hawai'i.  Although CCI was a Colorado corporation and Lewis Electric was later reincorporated in Colorado, the two companies thus deliberately exploited the Hawai'i business market and entered contractual relationships that were centered here.  It is fair to hale CCI and Lewis Electric into Hawai'i court to adjudicate Lewis' claim that they breached those contracts.

### ii.   **The Ibarras**

The Court similarly has specific jurisdiction over Adam because he personally signed the sale contracts on behalf of CCI, thus reaching out beyond his home in Texas, deliberately entering into a contractual relationship centered in Hawai'i, and exploiting the Hawai'i business market by becoming a decision-making owner of a Hawai'i-based business.

As for Mary, her contacts with Hawai'i are less clear.  She was only a 19% owner of CCI, her approval was not needed to engage in business ventures or contracts, and, unlike with Adam, her approval is not evident on any of the contracts at issue.  On the other hand, she was one of only three owners of Lewis Electric, making her a principal stakeholder in the company, and Lewis alleges she was aware of the sale contracts, including the Side Agreement, which had a substantial impact on her share of net revenue from Lewis Electric—to the tune of

$332,500.[8]  *See* Dkt. No. 1 ¶ 24.  Lewis also alleges, albeit without detail, that Mary concealed Adam's and/or Lewis Electric's assets in her personal bank accounts to hide transferred funds.  *Id.* ¶ 25.  It is unclear whether these contacts suffice to create specific jurisdiction over Mary in Hawai'i.  However, since the Court does not find Mary liable, *see infra*, Sections II.2.b, II.8, the question does not need to be resolved.[9]

### c.   Venue

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events at issue, including the contractual relationships and at least some of the relevant business activities, occurred in this district.

## II.   *Eitel* Factors

Following a determination on jurisdiction, the Court must decide whether to grant default judgment by weighing the seven *Eitel* factors.  782 F.2d at 1471–72.

---

[8]Mary's 19% share of the Ibarras' 80% of Lewis Electric was 23.75%.  Thus, Mary's share of the $1.4 million maximum promised to Lewis in the Side Agreement was $332,500.

[9]If Mary were Lewis Electric's alter ego, then Lewis Electric's contacts with Hawai'i could be imputed to Mary for purposes of personal jurisdiction.  *See Ranza v. Nike, Inc.*, 793 F.3d 1059, 1065 (9th Cir. 2015) (holding that employer was not an alter ego of its parent corporation, but that if it *had been*, the parent corporation's contacts could be attributed to the employer to establish personal jurisdiction over the employer) (citation omitted); *see also Apple, Inc. v. Allan & Assocs. Ltd.*, 445 F. Supp. 3d 42, 51–52 (N.D. Cal. 2020) ("[U]nder the federal law governing the exercise of personal jurisdiction, if a corporation is the alter ego of an individual defendant, . . . 'the Court may pierce the corporate veil jurisdictionally and attribute "contacts" accordingly.'") (quoting *Certified Bldg. Prods., Inc. v. NLRB*, 528 F.2d 968, 969 (9th Cir. 1976)).  But since Lewis has not established that Mary is Lewis Electric's alter ego, the Court cannot impute Lewis Electric's contacts to Mary.

### 1.    Possibility of Prejudice

The first factor considers whether the plaintiff would suffer prejudice if default judgment were not entered.  Here, absent entry of default judgment, Lewis will have no other recourse for recovery.  Accordingly, the first factor favors entry of default judgment.

### 2.    Merits of Plaintiff's Substantive Claims

#### a.    Breach of Contract Against CCI and Lewis Electric

To prevail on a breach of contract claim, a plaintiff must show: (1) that the contract was valid; (2) that he performed under the contract; (3) that the defendants failed to perform; (4) that the defendants' failure was the proximate cause of his injury; and (5) that his damages were of the nature and extent reasonably foreseeable by the defendants when the contract was entered into.  *Calipjo v. Purdy*, 439 P.3d 218, 225 (Haw. 2019).  Lewis has met these five requirements for his breach of contract claims against CCI and Lewis Electric.

*First*, Lewis has shown that the three pertinent contracts—the MIPA, Note, and EA—were valid contracts.  Three elements create a valid contract in Hawai'i: (1) capacity, (2) offer and acceptance, and (3) consideration.  *Id.*  The first element is met because Adam, who signed the MIPA, Note, and EA, was of the age of majority and sound mind, and was authorized to contract on behalf of the companies.  *See Balogh v. Balogh*, 332 P.3d 631, 647 (Haw. 2014).

13

To meet the second element, valid offer and acceptance, "[t]here must be a mutual assent or a meeting of the minds on all essential elements or terms . . . ." *Earl M. Jorgensen Co. v. Mark Const., Inc.*, 540 P.2d 978, 982 (1975) (citation omitted).  This mutual assent can be objectively deduced from the parties' "language or by implication from their conduct and the surrounding relevant circumstances."  *Id.* at 979, 982.  "An offer must be sufficiently definite . . . that the consideration promised is reasonably clear."  *Calipjo*, 439 P.3d at 226.

Here, the Court finds from the undisputed facts that there was mutual assent between Lewis and the company defendants on the essential terms of the contracts and that those terms were sufficiently definite.  The Court has copies of the written, signed contracts.  *See* Dkt. Nos. 1-1, 1-2, 1-3.  The contracts clearly and conspicuously lay out the essential terms of the bargain, including the names of the parties, the purpose of the agreements, the consideration, and relevant dates.  *See* MIPA, Dkt. No. 1-1 at 2, 8, 50; Note, Dkt. No. 1-2 at 1, 17, 20–21; EA, Dkt. No. 1-3 at 1–3, 13–14.  Thus, there was a valid offer and acceptance for all three contracts.

Finally, the Court finds the third element, consideration, is also met.  Consideration is "a bargained for exchange whereby the promisor receives some benefit or the promisee suffers a detriment."  *Calipjo*, 439 P.3d at 232–33 (citation omitted).  For the MIPA, Lewis agreed to transfer his 100% membership interest in

14

Lewis Electric to CCI in exchange for the $185,000.00 Note.  *See* Dkt. Nos. 1-1, 1-2.  For the EA, Lewis agreed to continue working for Lewis Electric as President beyond the company sale date in exchange for a $175,000.00 annual salary plus three percent annual raises and the opportunity to earn bonuses.  *See* Dkt. No. 1-3. Since all three elements are present, the MIPA, Note, and EA are valid contracts.

*Second*, Lewis performed under the contracts.  He transferred his membership interest in Lewis Electric to CCI in accordance with the MIPA, and he worked at Lewis Electric until July 21, 2017 in accordance with the EA, thus entitling him to receive the benefits for which he bargained.  Dkt. No. 163-1 at 8.

*Third*, CCI and Lewis Electric failed to perform.  CCI only paid Lewis a portion of what it owed under the Note, Dkt. No. 1 ¶ 17, and Lewis Electric stopped paying Lewis' salary under the EA after June 20, 2016.  *Id.* ¶ 18.

*Fourth*, Defendants' failure to perform caused damage to Lewis by depriving him of money owed to him.  And *fifth*, the obligations to which CCI and Lewis Electric subjected themselves under the Note and EA were explicit and straightforward, and thus Lewis' damages, which are tied closely to those obligations, were reasonably foreseeable.

Because Lewis has met all five requirements to show breach of contract against both CCI and Lewis Electric, these claims are meritorious.

### b. Breach of Contract Claims Against the Ibarras Under the "Alter Ego" Theory of Liability

In Hawai'i, a court may "pierce the corporate veil"—look past a corporation's formal existence to hold another entity or individual liable—when that entity or individual treats the corporation as his "alter ego."[10] *Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co.*, 982 P.2d 853, 869 (Haw. 1999), *superseded by statute on other grounds as noted in Davis v. Four Seasons Hotel Ltd.*, 228 P.3d 303, 308 n.9 (Haw. 2010). A corporation is considered another individual's alter ego (or vice versa) when the "corporation is the mere instrumentality or business conduit" of the individual. *Id.* at 870. The purpose of the "alter ego" doctrine is to prevent injustice when the corporate fiction "has been used as a subterfuge," the rationale being that if the shareholders "disregard the proper formalities of a corporation, then the law will do likewise." *Id.* (quoting *1 Fletcher Cyclopedia*, § 41.10 at 568–81). "[T]hose who fail to maintain the corporate formalities cannot expect the state to grant them the limited liability that flows from the corporate form." *Id.* However, "[c]ourts apply the alter ego doctrine with great caution and reluctance. In fact, many courts require exceptional circumstances before disregarding the corporate form." *Id.*

---

[10]Whether alter ego liability exists is determined by the law of the forum state. *In re Schwarzkopf*, 626 F.3d 1032, 1037 (9th Cir. 2010).

To prevail on an alter ego theory in Hawai'i, a plaintiff must show that (1) "the corporation is not only influenced and governed by [the individual], but that there is such a unity of interest . . . that the individuality, or separateness, of [the individual] and corporation has ceased," and (2) "an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice." *Id.* at 871 (citation omitted). To guide courts in evaluating whether the required "unity of interest" exists, the Hawai'i Supreme Court has identified at least twenty-five factors to consider. *Id.* at 871–72.[11] The factors are not exhaustive, and no one factor is dispositive. Rather, a totality of the circumstances, balancing approach is taken.

---

[11]Some of the factors are:

[1] Commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses; [2] the treatment by an individual of the assets of the corporation as his own; [3] the failure to obtain authority to issue stock or to subscribe to or issue the same; [4] the holding out by an individual that he is personally liable for the debts of the corporation; [5] the identical equitable ownership in the two entities; [6] the identification of the equitable owners thereof with the domination and control of the two entities; [7] identity of . . . directors and officers of the two entities in the responsible supervision and management; [8] sole ownership of all of the stock in a corporation by one individual or the members of a family; [9] the use of the same office or business location; [10] the employment of the same employees and/or attorney; [11] the failure to adequately capitalize a corporation; [12] the total absence of corporate assets, and undercapitalization; [13] the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; [14] the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities; [15] the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; [16] the use of the corporate entity to procure labor, services or merchandise for another person or

Here, Lewis argues that there is a unity of interest between the Ibarras and

CCI, and between the Ibarras and Lewis Electric because:

- By transferring funds from Lewis Electric to B&B and other companies to which CCI owed money, Adam diverted Lewis Electric's corporate funds "for uses that did not serve Lewis Electric's corporate interests," and for his own use.  Dkt. No. 163-1 at 22 (*Robert's* Factors 1 and 2).

- By the same actions, Adam demonstrated a disregard of legal formalities, a lack of arms-length dealing, and a manipulation of assets among entities he owned.  *Id.* (*Robert's* Factors 15 and 17).

- By the same actions, Adam severely undercapitalized Lewis Electric, resulting in an inability to meet payroll and other financial obligations and forcing the cancelation of contracts.  *Id.* at 23 (*Robert's* Factors 11 and 12).

- CCI must have also been undercapitalized because of actions that Lewis does not identify, since it was unable to pay its relatively modest obligation on the Note.  *Id.* at 24 (*Robert's* Factors 11 and 12).

---

entity; [17] the diversion stockholder [sic] or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another; [18] the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions; and [19] the formation and use of a corporation to transfer to it the existing liability of another person or entity.

*Robert's*, 982 P.2d at 871 (quoting *Associated Vendors, Inc. v. Oakland Meat Co.*, 26 Cal. Rptr. 806, 838–40 (Cal. Dist. Ct. App. 1962)).  Other factors are:

(1) incorporation for the purpose of circumventing public policy or statutes; (2) whether the parent finances the subsidiary; (3) whether the subsidiary has no business or assets except those conveyed to it by the parent; (4) whether the parent uses the subsidiary's property as its own; (5) whether the directors of the subsidiary do not act independently in the interest of the corporation but take their orders from and serve the parent; and (6) whether the "fiction of corporate entity . . . has been adopted or used to evade the provisions of a statute."

*Id.* (quoting *Kavanaugh v. Ford Motor Co.*, 353 F.2d 710, 717 (7th Cir. 1965)).

- The fact that CCI was unable to meet its obligation so soon after the sale of Lewis Electric leads to the reasonable inference that the Ibarras intentionally contracted through CCI in order to shield themselves from personal liability, knowing they would not end up paying Lewis. *Id.* (*Robert's* Factor 18).

- Through CCI, Adam, Mary, and Colarelli served as owners, directors, and officers of both Lewis Electric and B&B, rendering them the sole individuals with domination and control over the entities and responsibility for the companies' supervision and management. *Id.* at 23 (*Robert's* Factors 5, 6, 7, and 8).

- The entities have the same business address and use the same attorneys and some of the same employees. *Id.* (*Robert's* Factors 9 and 10).

Taking Lewis' facts and allegations as true, Lewis has not adequately proven the requisite unity of interest between the Ibarras and CCI or the Ibarras and Lewis Electric. Although Lewis has provided some evidence and allegations that up to thirteen of the factors are met (some of which apply to both companies), there are still at least twelve factors Lewis has not addressed at all. Lewis provides no information to help the Court understand whether the unaddressed factors are not applicable, neutral, or weigh against finding unity of interest. Thus, the Court cannot assess the *totality* of the circumstances. Especially considering the strong public policy against piercing the veil, the Court declines to adopt Lewis' alter ego conclusions in a partial vacuum.[12]

---

[12]Since the first factor of alter ego liability, unity of interest, has not been shown, the Court does not reach the second factor, whether maintaining the corporate fiction would sanction a fraud or promote injustice. *See id.* at 871.

### 3.    Sufficiency of the Complaint

The second and third factors are closely related.  As detailed above, the allegations in the Complaint are sufficiently pled against CCI and Lewis Electric but not the Ibarras.  Accordingly, this factor weighs in favor of default judgment against CCI and Lewis Electric but not the Ibarras.

### 4.    The Sum of Money at Stake in the Action

This factor requires the Court to "consider the amount of money at stake in relation to the seriousness of [the Defendants'] conduct."  *See PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) (citing *Eitel*, 782 F.2d at 1472).  Lewis' Motion seeks a total of $538,568.68 in damages, including $128,945.67 on the Note, $182,503.12 in unpaid salary, $50,000.00 in unreimbursed business expenses, $90,362.20 for attorneys' fees, and $86,757.69 in prejudgment interest.  *See* Dkt. No. 163-22 at 1.  Lewis seeks no damages related to the substantial profit-based bonuses contemplated in the EA, *see* Dkt. No. 1-3 at 14, or the revenue sharing contemplated in the Side Agreement, *see* Dkt. No. 1-4 at 1.  Presumably, the bonuses and revenue sharing did not happen for the reasons asserted by Lewis in the Complaint.  The Court thus finds that Lewis' damages request is tailored to Defendants' specific wrongful conduct, and this factor weighs in favor of granting default judgment.

### 5.    The possibility of a dispute concerning material facts

As explained above, the well-pled factual allegations of the Complaint relating to liability must be taken as true.  *TeleVideo*, 826 F.2d at 917–18.  Thus, because Lewis' material factual allegations are undisputed, this factor favors default judgment.

### 6.    Whether the default was due to excusable neglect

CCI and Lewis Electric have failed to respond to Lewis' allegations, even though they were served through their shared registered agent on October 15, 2019, *see* Dkt. Nos. 16–17, *and* even though their shared counsel represented the fifth Defendant, Colarelli, in defending this action.  The Ibarras have also failed to respond, despite court-approved service by publication.  *See* Dkt. Nos. 34, 45. Thus, the record suggests that default was not due to excusable neglect, but rather Defendants' conscious and willful decision not to defend the action.  Thus, this factor favors default judgment.

### 7.    The strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits

Under Rule 55, "termination of a case before hearing the merits is allowed whenever a defendant fails to defend an action."  Here, the Defendants' default makes a decision on the merits impractical, if not impossible.  Thus, this factor does not preclude the Court from entering default judgment against them.

### 8.    Totality of the *Eitel* Factors

All seven factors favor granting default judgment against CCI and Lewis Electric.  The second factor weighs heavily against granting default judgment against the Ibarras.  Accordingly, the Court enters default judgment in Lewis' favor against CCI and Lewis Electric but not the Ibarras.

## III.    Remedy

Although Lewis' allegations regarding liability are taken as true, he must provide proof of damages.  *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).  The Court awards damages accordingly, as explained below.

### 1.    Lewis has proven CCI owes him $129,551.16 under the Note.

Lewis provided the Court with a copy of the Note, which states that CCI will pay him $185,000.00 plus five percent annual interest, accruing monthly.  Dkt. No. 1-2.  He has only received $94,124.95 of that amount ($83,391.26 of which is principal), with no payments having been made since June 20, 2016.  Dkt. No. 163-1 at 7–8.  That leaves $101,608.74 in principal plus $27,942.42 in interest (*see supra*, n.5), for a total of $129,551.16, which the Court awards against CCI and in favor of Lewis.

### 2.    Lewis has proven Lewis Electric owes him $182,503.12 in Unpaid Salary under the EA.

Lewis provided the Court with a copy of the EA, which states that Lewis Electric will pay him an annual salary of $175,000.00 with three percent annual

increases.  *See* Dkt. No. 1-3.  Lewis worked at Lewis Electric from February 16, 2015, the day the EA became effective, until July 21, 2017, and received no salary after June 20, 2016.  Dkt. No. 163-1 at 8.  As a result, Lewis claims Lewis Electric owes him seven months of salary at the second-year $180,250.00 rate and five months of salary at the third-year $185,657.50 rate for a total of $182,503.12.  No interest is included.  The Court thus awards $182,503.12 to Lewis and against Lewis Electric.

### 3.   Lewis has not proven that Lewis Electric owes him $50,000.00 in unreimbursed business expenses under the EA.

Lewis claims Lewis Electric owes him the round sum of $50,000.00 for "business expenses that were never reimbursed, in violation of the [EA]."  Dkt. No. 163-1 at 8.  The EA promises Lewis reimbursement for "authorized expenses incurred in performing the Business Activities, so long as Employer previously authorized such expenditure."  Dkt. No. 1-3 at 3.  Lewis has provided no documentation or other proof of pre-authorization for the $50,000.00 in expenses, nor any documentation of any of the expenses themselves—what they were for, how much, or when they were incurred.  Without this information, the Court declines to award these damages.

### 4.   Prejudgment Interest

Lewis requests $86,757.69 in prejudgment interest.  Dkt. No. 163-1 at 12. He suggests that prejudgment interest has been accruing since December 12, 2017,

when he first made a demand on Defendants for the unpaid amounts under the

Note and EA, which at that time totaled $289,192.30.  He provides no other legal

or factual justification for the requested amount.[13]

In Hawai'i, prejudgment interest is awardable "in the discretion of the trial

court" as follows:

> In awarding interest in civil cases, the judge is authorized to designate
> the commencement date to conform with the circumstances of each
> case, provided that the earliest commencement date . . . [in breach of
> contract cases is] the date when the breach first occurred.

Haw. Rev. Stat. § 636-16; *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 839 P.2d

10, 36 (Haw. 1992).[14]  The Hawai'i Supreme Court has held that prejudgment

interest "serves to compensate for the loss of use of money due as damages . . . ,

thereby achieving full compensation for the injury those damages are intended to

redress." *Kalawaia v. AIG Haw. Ins. Co.*, 977 P.2d 175, 180 (Haw. 1999) (citation

omitted).  It is "[i]nterest on claims awarded for delay in payment," which is

"measured from the accrual of the claim for relief to the time of rendition of the

judgment." *Rodrigues v. State*, 472 P.2d 509, 518 (Haw. 1970).  The maximum

allowable interest rate is ten percent per year.  Haw. Rev. Stat. § 478-3.

---

[13]Although not detailed, it appears Lewis based his calculation using a simple interest rate of 10% accruing on $289,192.30 owing from December 12, 2017 to December 12, 2020 ($289,192.30 x 10% x 3 years = $86,757.69).  Of course, a fourth year has since passed, meaning interest using Lewis' calculations would now be an additional $28,919.23 for a total of $115,676.92.

[14]"In diversity actions, state law determines the rate of prejudgment interest." *Am. Tel. & Tel. Co. v. United Comput. Sys., Inc.*, 98 F.3d 1206, 1209 (9th Cir. 1996) (citation omitted).

Here, where Lewis has waited a substantial time to receive his salary from Lewis Electric under the EA, an award of prejudgment interest on that amount, $182,503.12, is appropriate.  The date from which prejudgment interest should accrue in order to fully compensate Lewis for his loss is the date he identified: the December 2017 Demand letter.  Accordingly, the Court awards prejudgment interest against Lewis Electric and in favor of Lewis under the EA in the amount of $73,001.25 ($182,503.12 x 10% x 4 years).

However, the Court finds it is not appropriate to award prejudgment interest on the amount owed by CCI under the Note, $129,551.16, because awarding such interest would amount to a double recovery.  The contractually agreed-upon five percent interest rate has already been factored into that claim, with the five percent rate having been agreed to by the parties, thereby overriding consideration of any other rate under Haw. Rev. Stat. § 478-3.  Thus, the Court declines to award prejudgment interest in favor of Lewis against CCI.

### 5.    Attorneys' Fees

Finally, Lewis requests consequential damages for attorneys' fees in the amount of $90,362.20, or twenty-five percent of the non-interest damages requested.  Dkt. No. 163-1 at 12.[15]  Other than generically citing to Haw. Rev. Stat.

---

[15]Again, Lewis provides no demonstrative calculation, but 25% of the non-prejudgment interest damages requested ($128,945.67 + $232,503.12) equals the requested amount of $90,362.20.

§ 607-14, he provides no legal or factual justification for these figures.  The Court declines to award attorneys' fees because Lewis has provided no information from which the Court can determine that the fees are reasonable.

In Hawai'i, "attorney's fees are chargeable against the opposing party when so authorized by statute, rule of court, agreement, stipulation, or precedent." *Cnty. of Haw. v. C & J Coupe Family Limited Partnership*, 242 P.3d 1136, 1161 (Haw. 2010).[16]  Under Haw. Rev. Stat. § 607-14:

> In all the courts, in all actions in the nature of assumpsit and in all actions on a promissory note or other contract in writing that provides for an attorney's fee, there shall be taxed as attorneys' fees, to be paid by the losing party and to be included in the sum for which execution may issue, a fee that the court determines to be reasonable; provided that the attorney representing the prevailing party shall submit to the court an affidavit stating the amount of time the attorney spent on the action and the amount of time the attorney is likely to spend to obtain a final written judgment, or, if the fee is not based on an hourly rate, the amount of the agreed upon fee. The court shall then tax attorneys' fees, which the court determines to be reasonable, to be paid by the losing party; provided that this amount shall not exceed twenty-five per cent of the judgment.

To award attorneys' fees under this statute, the Court must determine whether: (1) the moving party is the prevailing party; (2) a promissory note or contract provides for the attorneys' fees in writing, *or* the action is in the nature of assumpsit; and (3)

---

[16]"[A] federal court sitting in diversity applies state law to determine whether Plaintiff is entitled to attorney's fees and costs." *See In re Larry's Apartment, LLC*, 249 F.3d 832, 838 (9th Cir. 2001) (citing *Price v. Seydel*, 961 F.2d 1470, 1475 (9th Cir. 1992)).

the hourly rate, fees, and costs requested are reasonable.  *See Haw. Airlines, Inc. v. PL Dufay Aviation Mgmt., LLC*, 2020 WL 5539798 at *2 (D. Haw. 2020).

Here, although Lewis is the prevailing party,[17] and his claims are in the nature of assumpsit,[18] the Court has no way of determining whether the fees requested are reasonable.  Hawai'i courts determine the reasonableness of attorneys' fees using a method similar to the traditional "lodestar" calculation, which multiplies the number of hours reasonably expended by a reasonable hourly rate.  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *DFS Grp. L.P. v. Paiea Props.*, 131 P.3d 500, 505 (Haw. 2006).[19]  Whether an hourly rate is reasonable is

---

[17]"[I]n general, a party in whose favor judgment is rendered by the district court is the prevailing party" for purposes of awarding attorneys' fees.  *Sierra Club v. Dep't of Transp. of State of Haw.*, 202 P.3d 1226, 1260 (Haw. 2009).  The favorable judgment need not result from a ruling on the merits but can result from default judgment.  *See, e.g.*, *Haw. Airlines, Inc.*, 2020 WL 5539798 at *2 (quoting *Ranger Ins. Co. v. Hinshaw*, 79 P.3d 119, 124 (Haw. 2003)).

[18]"Assumpsit is a common law form of action which allows for the recovery of damages for non-performance of a contract, either express of implied, written or verbal, as well as quasi contractual obligations."  *808 Dev., LLC v. Murakami*, 141 P.3d 996, 1013 (Haw. 2006).  "Under Hawai'i case law, an action in the nature of assumpsit includes 'all possible contract claims,'" including those whose contracts do not mention attorneys' fees.  *See Helfand v. Gerson*, 105 F.3d 530, 537 (9th Cir. 1997) (citation omitted).

[19]Hawai'i courts also evaluate other factors, including:

> (1) the time and labor required, the novelty and difficulty of the questions involved and the skill requisite properly to conduct the cause; (2) whether the acceptance of employment in the particular case will preclude the lawyer's appearance for others in cases likely to arise out of the transaction, and in which there is a reasonable expectation that otherwise he would be employed, or will involve the loss of other employment while employed in the particular case or antagonisms with other clients; (3) the customary charges of the Bar for similar services; (4) the amount involved in the controversy and the benefits resulting to the client from the services; (5) the contingency or the certainty of the compensation; and (6) the character of the employment, whether casual or for an established and constant client.

determined by assessing the prevailing market rate in the relevant community for similar work performed by attorneys of comparable skill, experience, and reputation. *Roberts v. Honolulu*, 938 F.3d 1020, 1023 (9th Cir. 2019). There is a strong presumption that the lodestar amount calculated is reasonable. *See Schefke v. Reliable Collection Agency, Ltd.*, 32 P.3d 52, 87 n.72 (Haw. 2001) (citing *Burlington v. Dague*, 505 U.S. 557, 562 (1992)).

However, none of this analysis is possible here because the record provides no justifying information for the requested fees—no indication of the timekeeper or the amount he/she charged, no description of that person's skill, experience or reputation, no description of what that person did, no indication of the time spent performing the unidentified tasks—other than to state that they equal twenty-five percent of non-interest damages. *See* Haw. Rev. Stat. § 607-14 (requiring the prevailing party's attorneys to submit an explanatory affidavit "stating the amount of time the attorney spent on the action and the amount of time the attorney is likely to spend to obtain a final written judgment, or, if the fee is not based on an hourly rate, the amount of the agreed upon fee"); *Roberts v. Honolulu*, 938 F.3d at 1024 ("It is the responsibility of the attorney seeking fees to submit evidence to support the requested hourly rate.") (citing *Hensley*, 461 U.S. at 433); *Sam K. ex*

---

Sheehan v. Centex Homes, 853 F. Supp. 2d 1031, 1041 (D. Haw. 2011) (citing *Chun v. Bd. of Trs. of Emps.' Ret. Sys. of Haw.*, 106 P.3d 339, 358 (Haw. 2005)).

*rel. Diane C. v. Haw. Dep't of Educ.*, 788 F.3d 1033, 1041 (9th Cir. 2015) ("The burden is on the fee applicant 'to produce satisfactory evidence' of the prevailing market rates.") (citing *Blum v. Stenson*, 465 U.S. 886, 895 (1984)); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) ("To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."); Local Rule 54.2(f), (h) (requiring parties requesting attorneys' fees to provide, among other things, a "summary table" detailing the timekeeper, hours spent, and hourly rate, an itemization and description of the work performed, and a supporting affidavit that explains the relevant qualifications, experience, and case-related contributions of the timekeepers).

## **CONCLUSION**

Consistent with the foregoing, the Court hereby directs entry of default judgment in favor of Plaintiff Lewis and against Defendant CCI in the amount of **$129,551.16.** The Court also directs entry of default judgment in favor of Plaintiff Lewis and against Defendant Lewis Electric in the amount of $182,503.12 plus $73,001.25 in prejudgment interest for a total of **$255,504.37**.

IT IS SO ORDERED.

DATED: December 27, 2021 at Honolulu, Hawai'i.

Derrick K. Watson
United States District Judge